IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JACQUELINE D. BROWN,<br>    Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br>    Defendant. | Case No. 1:14-cv-01078-JEH |

**Order and Opinion**

Now before the Court is the Plaintiff's, Jacqueline D. Brown's, Motion for Summary Judgment (Doc. 17), the Defendant's, Commissioner of Social Security's, Motion for Summary Affirmance (Doc. 22), and the Plaintiff's Reply[1] (Doc. 24). For the reasons stated herein, the Court DENIES the Plaintiff's Motion for Summary Judgment and GRANTS the Defendant's Motion for Summary Affirmance.[2]

**I**

On March 27, 2012, Brown filed applications for disability insurance benefits and supplemental security income, alleging disability beginning on December 17, 2011. Her claims were denied initially on July 11, 2012, and were denied upon reconsideration on September 18, 2012. On October 2, 2012, Brown filed a request for hearing concerning her applications for disability insurance benefits and supplemental security income. Hearings were held before the

---

[1] The Court has reviewed the Plaintiff's Reply, though it is little more than a rehashing of the points she made in her Motion for Summary Judgment.
[2] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 15) on the docket.

1

Honorable Diane Raese Flebbe (ALJ) on May 13, 2013 and August 12, 2013, at both times Brown appeared without representation.[3] Following the hearings, Brown's claims were denied on November 1, 2013. Her request for review by the Appeals Council was denied on February 25, 2014, making the ALJ's decision the final decision of the Commissioner. Brown filed the instant civil action seeking review of the ALJ's decision on March 5, 2014.

## II

At the time she applied for benefits, Brown was a 50 year old divorced woman living in Peoria, Illinois with her mentally challenged adult son. At the time of the August 2013 hearing, Brown was renting out the basement of her home to another individual, Russell Nelson, with whom Brown was friends.

At the first hearing, Brown testified that she suffered from depression, panic attacks, and anxiety almost all of her life. She testified that she was 5'2" tall and weighed 155 pounds. She also testified that she last consumed alcohol, a glass of wine, on her birthday on May 2, 2013. Brown stated that she did not go to any doctors for over a year before the hearing. Brown then returned to the ALJ's previous question regarding alcohol use and told the ALJ "this alcohol thing, that's really throwing me for a big loop." AR 97. Brown further discussed the question of her alcohol use, how she believed her medical records were contradictory in that regard, and that her dad was an alcoholic so she had to be careful with alcohol. AR 98-99. The hearing was then postponed to give Brown an opportunity to obtain counsel.

At the second hearing on August 12, 2013, Brown testified that she was 5'2" and weighed about 150 pounds. She testified that she attempted to be her son's Personal Assistant (PA), for pay, for approximately three months at the

---

[3] The May 2013 hearing ended shortly after it began upon Brown stating that she "might need a lawyer." AR 92. The ALJ then postponed the hearing to provide Brown with an opportunity to obtain a lawyer.

beginning of 2012. Her attempt to do so did not work out and she stopped serving as her son's Personal Assistant in March 2012. Brown again testified that the last time she consumed alcohol was on her birthday on May 2, 2013. She explained that she had her sanitation license because she had always run kitchens as her employment in the past. Brown also testified that of all of her problems, she believed that her anxiety and stress were the biggest problems that kept her from working. The week before the hearing, Brown testified that she visited the emergency room. She stated that she went to the hospital to get her medication tweaked because it was not "holding" her. AR 39. She also stated that she worried all the time. She explained her days as either blue, green, or purple days. On blue days she could just lie in bed and cry all day. She testified to experiencing five blue days per week. On green days, Brown explained that she could get up and walk out of her room. She testified to experiencing four to five green days in a week. She also testified to experiencing no green days in an average week. On purple days, Brown explained that those were pretty good days where she could step outside. She testified to experiencing "probably two" purple days in an average week. AR 42.

    Brown testified that gloomy, rainy, and wintertime weather were a trigger for her anxiety. She further testified that she liked to be by herself and not bothered. She testified that while her main jobs had always been as a supervisor, she had reached the point where she could not manage people because she could not even manage her own time, thoughts, or energy to sustain an eight hour work day. Brown then testified that her issues with anemia recurred within the last two years and while she was currently taking iron pills, she did not think they were helping too much. She additionally testified that she was self-medicating with aspirin and ibuprofen. She testified that she had arthritis that affected her back, knees, and legs so that she could hardly walk.

3

In regard to her time at home, Brown testified that a personal caregiver came to her home daily to take care of Brown's adult mentally challenged son. Brown testified that her renter did the cooking, dishes, vacuuming, and lawn mowing. Her son and renter took out the garbage. She testified that most of the time her renter and she went to the grocery story together. However, before the renter moved in, Brown explained that her son's PA would cook his meals, clean his dishes, and clean up the house to the extent doing so was picking up after her son. Brown further testified that while she dressed and showered on her own, she did not do those things regularly. She stated that she was able to pay bills and handle finances. Brown also stated that she had an email account, Facebook account, and cell phone. She said that she spent no time on her cell phone in an average day. Brown testified that she generally just sat in her room most of the day.

The ALJ then proceeded to question Brown's renter, Russell Nelson. He testified that Brown had mood changes day to day which he observed by being with her from mid-morning through early afternoon each day. Nelson explained that he spent time with Brown's son to help Brown out. Nelson also testified that he and Brown split the cooking chores and that he helped out around the house.

The ALJ then questioned the Vocational Expert (VE), Ronald Malik. The ALJ asked the VE to assume an individual who had the ability to perform light exertion work, but could not climb ladders, ropes, or scaffolds, could only occasionally climb ramps and stairs, balance, stoop, crouch, and crawl, and with the need to avoid concentrated exposure to extreme cold, wetness, humidity, and extreme heat. The ALJ further asked the VE to assume that the individual would have periods of symptom exacerbation with the resulting moderate limitations in concentration, persistence, or pace when attempting complex or detailed tasks. Thus, the ALJ asked the VE to limit the individual to jobs that did not involve

complex or detailed job processes, little in the way of change in job process from day to day, no work interaction with coworkers and supervisors, and all work to be completed independently rather than as a team member. The VE testified that the individual would be unable to perform Brown's past work.

The ALJ asked the VE to further assume the individual had Brown's age, education, and work history. When asked whether there were jobs that could be done by such an individual, the VE responded that there were and identified: pre-assembler, packager, and assembler. AR 78. The ALJ added to the hypothetical individual the limitation of no fast-paced hourly production demands. The VE responded that the identified jobs were not eliminated with that further limitation. The ALJ then asked the VE if the jobs would remain if the hypothetical individual missed work two days or more a month. The VE responded that all of the identified jobs would be eliminated. The VE also testified that all of the jobs would be eliminated if the individual was off task 20% or more of the day due to distraction caused by her symptoms.

### III

In her Decision, the ALJ found that Brown had the severe impairments of osteoarthritis, anemia, hypertension, mild cardiac impairment per testing which identified mild to moderate valve regurgitation and mild calcification of the mitral and aortic valves, anxiety, depression, and alcohol abuse. Brown's claimed error before this Court relates to the ALJ's Residual Functional Capacity (RFC) finding.

The ALJ made the following RFC finding:

> The claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing ladders/ropes/scaffolds; occasional climbing ramps/stairs, balancing, stooping, kneeling, crouching and crawling; and the need to avoid concentrated exposure to temperature extremes, wetness

and humidity. Because of mental impairments and symptoms combined, she may during times of symptom exacerbation have moderate limitations in concentration, persistence or pace when attempting complex or detailed tasks and so she is limited to jobs that do not require complex or detailed job processes, little in the way of change in job processes from day-to-day, and no fast-paced hourly production demands. In addition, there should be no work interaction with general public and only occasional work interaction with coworkers and supervisors, but work should be done independently rather than as a member of a team.

AR 16. In making that finding, the ALJ exhaustively recounted Brown's own testimony (set forth above), her primary care physician's, Dr. Henry Gross's, treatment notes, and the State Agency doctors' physical and psychological evaluations. The ALJ also discussed Nelson's testimony, Brown's medications, Brown's August 2013 emergency room visits, and the State Agency evaluators' findings and conclusions.

## IV

Brown's Motion for Summary Judgment does not cogently identify the issues she wishes to raise before the Court. However, the Commissioner identifies the "gravamen" of Brown's brief to be that the ALJ's findings as to her RFC and/or credibility were unsupported by substantial evidence. Because the Court agrees with the Commissioner's articulation of the issues and because the Commissioner's brief in opposition sufficiently addresses the issues Brown raises, the Court will address those issues as articulated by the Commissioner.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. See *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000); *Pugh v Bowen*, 870 F2d 1271 (7th Cir 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 USC § 405(g).

Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v Barnhart*, 297 F3d 589, 593 (7th Cir 2002).  The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  *Delgado v Bowen*, 782 F2d 79, 82 (7th Cir 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision.  *Richardson v Perales*, 402 US 389, 390 (1971), *Henderson v Apfel*, 179 F3d 507, 512 (7th Cir 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled.  Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability.  See 20 CFR §§ 404.1566, 416.966 (1986).  The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 USC § 1382(c)(a)(3)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  *McNeil v Califano*, 614 F2d 142, 143 (7th Cir 1980).  The factual determination is made by using a five-step test.  See 20 CFR §§ 404.1520, 416.920.  In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

> 3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;
>
> 4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and
>
> 5) is unable to perform any other work existing in significant numbers in the national economy.

Id.  An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled.  A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled.  *Garfield v Schweiker*, 732 F2d 605 (7th Cir 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4.  However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment.  *Tom v Heckler*, 779 F2d 1250 (7th Cir 1985); *Halvorsen v Heckler*, 743 F2d 1221 (7th Cir 1984).

In the instant case, Brown claims error on the ALJ's part at Step Four.

### A

Brown essentially argues that the ALJ's RFC finding was incorrect based upon the evidence of record.  The Commissioner first argues that the ALJ's credibility findings were sound.  The Commissioner highlights that:  the ALJ identified multiple material inconsistencies in Brown's testimony; the ALJ described how Nelson's testimony contrasted with Brown's; Brown made representations about the care she provided for her son on questionnaires that differed from her testimony; Brown made inconsistent statements regarding alcohol consumption; and Brown's testimony that she did not engage in any

work since 2011 conflicted with an emergency room record describing her as a cook at a restaurant shortly before the August 2013 hearing.

Determinations of credibility made by the ALJ will not be overturned unless the findings patently wrong. *Shideler v Astrue*, 688 F3d 306, 310-11 (7th Cir 2012). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v Barnhart*, 442 F3d 536, 538 (7th Cir 2006) (citation omitted). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v Barnhart*, 357 F3d 697, 703 (7th Cir 2004); *Rice v Barnhart*, 384 F3d 363, 371 (7th Cir 2004).

Here, as the Commissioner points out, the ALJ provided very specific reasons for her finding that Brown's statements were not fully credible in terms of her alleged degree of limitation. The ALJ laid out the inconsistencies between Brown's testimony and representations made elsewhere (i.e. to medical staff, on Social Security forms, to State Agency examiners) pertaining to the chores she did at home, the extent to which she cared for her mentally challenged adult son, her alcohol use, and her work outside of the home. The ALJ did so only after she detailed much of the testimony and evidence earlier in her Decision that she later relied upon in setting forth her credibility finding. The ALJ's credibility determination was grounded upon observations that were both reasonable and

9

supported in the record. *Sims*, 442 F3d at 538. Her findings are not patently wrong. *Skarbek v Barnhart*, 390 F3d 500, 504-05 (7th Cir 2004).

**B**

In her Brief, Brown cites to a handful of provisions that she apparently believes guide the inquiry in her particular case and support a different RFC finding in her case. As for the first two provisions she cites pertaining to the physical exertion requirements of "light work" and individuals of "advanced age," the Commissioner argues that Brown was well within the category of an individual "closely approaching advanced age" (between the ages of 50 and 54) at the time she rendered her decision in 2013 when Brown was 52 years old. See 20 CFR § 404.1563(d)-(e) (defining "person closely approaching advanced age" and "person of advanced age"). Thus, the "issue" Brown attempts to raise about her alleged advanced age and the ALJ's finding that she was capable of doing light work is not even present in this case.

Brown next cites to 20 CFR § 404.1508 which provides:

> If you are not doing substantial gainful activity, we always look first at your physical or mental impairment(s) to determine whether you are disabled or blind. Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms (see § 404.1527).

In response to her citation to § 404.1508, the Commissioner argues that the ALJ found seven severe, medically determinable impairments and to the extent the ALJ did not find fibromyalgia to be a medically determinable impairment, the ALJ sufficiently explained that there was no diagnosis of such in the record, described a relevant physical examination, and noted the lack of rheumatologic evaluation or evaluation for fibromyalgia. The Commissioner correctly details

10

the ALJ's Decision in this regard and correctly discusses the fact that § 404.1508 *supports* the ALJ's severe impairment findings.

Next, Brown points out that the ALJ stated that, "State [A]gency evaluators concluded claimant's mental impairments were severe . . . ." AR 20. The Commissioner argues that "severe" is a term of art and when an impairment is found severe, the sequential evaluation process continues to the next step without an implication that the impairment is disabling. Indeed, Brown was not entitled to a favorable decision simply because the ALJ found that she had severe impairments. The Commissioner correctly argues that the inquiry proceeds to the next step of the sequential evaluation process and that in this case, in particular, the ALJ accounted for the limitations that were supported in the record in her RFC finding. See *Curvin v Colvin*, 778 F3d 645, 648 (7th Cir 2015) (explaining that the step two determination of severity is "merely a threshold requirement" which, when found, allows the sequential process to proceed to the next steps), quoting *Castile v Astrue*, 617 F3d 923, 926-27 (7th Cir 2010).

The Mental Residual Functional Capacity Assessment provided that "the client is functioning adequately and adaptively despite the complaints . . . Hence the client is partially credible and the client is able to understand and recall all but complex or detailed instructions. The anxiety disorder suggests a socially restricted setting with moderate limit of social expectations. Client retains psychological capability to do one and two step unskilled tasks at sga." AR 429. Exhibit B10F, also cited by the ALJ, provided that, "Based on mental status exam and [Activities of Daily Living] [claimant] has the ability to perform simple unskilled work at SGA." AR 433. The ALJ ultimately cited to ample record evidence in support of her RFC finding. Moreover, the ALJ amply accommodated Brown's limitations due to severe mental impairments in the RFC

where the limitations in the RFC went beyond those provided by the State Agency evaluators.

Brown also points out the ALJ's finding that, "The claimant is unable to perform any past relevant work." AR 21. Brown appears to believe that she was entitled to benefits based upon that finding. However, the Commissioner correctly explains that such a finding does not end the inquiry. Instead, the ALJ was tasked with determining whether other work existed in significant numbers in the national economy for an individual with Brown's RFC. See 20 CFR §§ 404.1520, 416.920. The ALJ fulfilled her obligation when she questioned the VE who testified that a significant number of jobs did exist for an individual with Brown's RFC.

The Plaintiff also filed additional exhibits in this case. The Exhibit that appears as (Doc. 13) on the docket includes a medical record dated September 24, 2013 and one dated July 23, 2014 and what appears to be further argument from Brown regarding why the ALJ erred in denying her disability benefits. The Exhibit that appears as (Doc. 20) on the docket includes a medical record dated November 2, 2014. The Commissioner only addresses Document 20, arguing that the medical record significantly post-dates the ALJ decision and should not warrant remand because the evidence is not new and material.

A court charged with reviewing a case may order a remand where "there exists 'new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding'." *Schmidt v Barnhardt*, 395 F3d 737, 741-742 (7th Cir 2005); see also 42 USC § 405(g). "Evidence is 'new' if it was 'not in existence or available to the claimant at the time of the administrative proceeding'." *Schmidt*, 395 F3d at 742. Evidence is deemed "material" if "there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." Id. However,

the new evidence is only material if it is also "relevant to the claimant's condition 'during the relevant time period encompassed by the disability application under review'." Id.  Evidence is deemed "material" if "there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." Id at 742.  However, the new evidence is only material if it is also "relevant to the claimant's condition 'during the relevant time period encompassed by the disability application under review'." Id.

     Here, the September 24, 2013, July 23, 2014 and November 2, 2014 medical records are certainly new.  The latter two, however, post-date the ALJ's Decision by more than eight months and more than one year, respectively.  Brown does not articulate why these 2014 medical records are material.  They are not material as they show Brown's condition at that later point in 2014, not what her condition was at the time relevant to the hearing on her disability application.  Furthermore, to the extent that Brown argues the September 2013 medical record is material because it shows a lower Hemoglobin (HGB) level on September 24, 2013 compared to the Hemoglobin level that pre-dated the ALJ's Decision on August 6, 2013, her argument fails.  The record is replete with lab results, particularly Hemoglobin levels, dated as early as December 15, 2004 and as late as August 6, 2013 at which time Brown's Hemoglobin level was 9.2.  See AR 504 (9.3 on June 6, 2014), 667.  The 9.2 value was also below the normal range.  Additionally, Brown does not direct the Court's attention to anywhere in the medical records that *were* before the ALJ which indicate the significance, if any, of Brown's Hemoglobin levels.  The evidence of Brown's Hemoglobin level on September 24, 2013 is not material because there is not a reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered; it is one isolated number from bloodwork that does not appear to be significant in any other medical records and was in fact low two times over at the time the ALJ

reviewed the medical records.

Finally, SSR 96-8p provides, "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  See also *Briscoe ex rel Taylor v Barnhart*, 425 F3d 345, 352 (7th Cir 2005) (stating that the ALJ's omission in not explaining how he arrived at his RFC conclusions, contrary to SSR 96-8p, was sufficient to warrant reversal of his decision).  Here, the ALJ provided the requisite narrative discussion.  In the end, the ALJ did not err in making the RFC finding that she did.

## V

In light of the foregoing, the ALJ did not err in denying Brown's claims for benefits.  This Court affirms the Commissioner's denial of benefits, and therefore DENIES Brown's Motion for Summary Judgment (Doc. 17) and GRANTS the Commissioner's Motion for Summary Affirmance (Doc. 22).

In light of the parties' consent, any appeal of this ruling must be made directly to the Seventh Circuit Court of Appeals within the time period prescribed by the Federal Rules of Appellate Procedure.

*It is so ordered.*

Entered on August 5, 2015.


                s/Jonathan E. Hawley
                U.S. MAGISTRATE JUDGE